No. 25-3733

# IN THE
# United States Court of Appeals
### FOR THE SIXTH CIRCUIT

————————

AMERICAN ASSOCIATION OF NURSE ANESTHESIOLOGY,
*Plaintiff-Appellant,*
v.
ROBERT F. KENNEDY, JR., SECRETARY OF THE UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
*Defendants-Appellees.*

————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION
CASE NO. 1:24-CV-01657

————————

## REPLY BRIEF OF PLAINTIFF-APPELLANT
## AMERICAN ASSOCIATION OF NURSE ANESTHESIOLOGY

MARK J. SILBERMAN
CHRISTOPHER T. GROHMAN
DAVID M. HOPKINS
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
71 S. Wacker Drive, Ste. 1600
Chicago, Illinois 60606
Telephone: 312-212-4949

*Attorneys for Plaintiff-Appellant
American Association of Nurse
Anesthesiology*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................. 2

    A.    AANA AND ITS MEMBERS PLED AND HAVE
          SUFFERED THE REQUISITE HARM ................................ 2

    B.    AANA PROPERLY PLED A CAUSAL
          CONNECTION BETWEEN THE
          GOVERNMENT'S ABDICATION OF ITS
          RESPONSIBILITY TO ENFORCE THE ACA
          NONDISCRIMINATION PROVISION AND
          THE HARM ITS MEMBERS ARE SUFFERING,
          ALL OF WHICH IS VERIFIED BY PUBLICLY
          AVAILABLE INFORMATION ............................................. 4

    C.    THE GOVERNMENT IMPROPERLY
          DESCRIBES THE AANA'S PLEADING
          OBLIGATIONS ................................................................... 7

    D.    THIS COURT SHOULD NOT REACH THE
          GOVERNMENT'S 12(B)(6) ARGUMENT IN
          THE FIRST INSTANCE ..................................................... 10

    E.    THE GOVERNMENT'S THEORIES
          REGARDING WHY IT CANNOT ENFORCE
          THE NON-DISCRIMINATION CLAUSE LACK
          MERIT ................................................................................ 11

          1.    HHS's Failure to Complete Rulemaking
                  Cannot Be the Justification for the
                  Government's Inaction ............................................... 12

          2.    Any Role the Departments of Labor or
                  Treasury Have in Rulemaking Does Not
                  Alter HHS's Ultimate Enforcement
                  Authority and Cannot be Presented as

Justification for Inaction or to Avoid
Mandamus .................................................. 15

3.  The States' Parallel Authority to Enforce
    This Provision of Federal Law Does
    Nothing to Relieve HHS of its Ultimate
    Enforcement Authority ............................. 18

4.  The Law Abhors an Absurd Result, and
    Concluding That No Path Exists to
    Remedy This Clear Discrimination In
    Violation of a Valid Law is Absurd ........................... 21

F.  HHS's Failure to Ever Enforce the
    Nondiscrimination Provision is Reviewable by
    Federal Courts Under Both a Mandamus Theory
    and UNDER the APA ........................................... 23

G.  The Government's BELATED (AND WAIVED)
    Adoption of unjustiFIED arguments presented
    in an unsolicited (and rejected) amicus brief Also
    Fail........................................................................... 25

CONCLUSION ........................................................................ 27

CERTIFICATE OF COMPLIANCE ......................................... 30

CERTIFICATE OF SERVICE................................................. 31

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Aiken Cnty,*
725 F.3d 255 (D.C. Cir. 2013) ......................................................... 8, 20

*In re Allied Supermarkets, Inc.*
951 F.2d 718 (6th Cir.1991) ............................................................. 11

*Armstrong v. Bush,*
924 F.2d 282 (D.C. Cir. 1991) ......................................................... 24

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................... 7

*Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.,*
474 F.3d 365 (6th Cir. 2007) ........................................................... 25

*Carpenters Indus. Council v. Zinke,*
854 F.3d 1 (D.C. Cir. 2017) ............................................................... 9

*Competitive Enter. Inst. v. NHTSA,*
901 F.2d 107 (D.C. Cir. 1990) ........................................................... 9

*Gillis v. U. S. Dep't of Health and Hum. Servs.,*
759. F.2d 565 (6th Cir. 1985) .......................................................... 24

*Mackinac Ctr. for Pub. Pol'y v. Cardona,*
102 F.4th 343 (6th Cir. 2024) ........................................................... 9

*Maine Cmty. Health Options v. United States,*
590 U.S. 296 (2020) ......................................................................... 21

*Maldonado v. Nat'l Acme Co.,*
73 F.3d 642 (6th Cir. 1996) ............................................................. 11

*Meade v. Pension Appeals & Review Comm.,*
966 F.2d 190 (6th Cir.1992) ............................................................. 11

*Mt. Emmons Mining Co. v. Babbitt*,
    117 F.3d 1167 (10th Cir. 1997)............................................................ 24

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety*
    *Admin.*,
    894 F.3d 95 (2d Cir. 2018) ........................................................... 8, 10

*Public Citizen Health Research Group v. Commissioner*,
    740 F.2d 21 (D.C. Cir. 1984) ................................................................ 25

*In re Public Employees for Environmental Responsibility*,
    957 F.3d 267 (D.C. Cir. 2020) ............................................................... 8

*Estate of Smith v. Heckler*,
    747 F.2d 583 (10th Cir.1984).............................................................. 24

*Smith v. Spizzirri*,
    601 U.S. 472 (2024) ............................................................................. 21

*Stewart v. IHT Ins. Agency Grp., LLC*,
    990 F.3d 455 (6th Cir. 2021)................................................................. 7

*United States v. McDowell Contractors, Inc.*,
    668 F.2d 256 (6th Cir. 1982)............................................................... 25

## Statutes

42 U.S.C. § 300gg.................................................................... passim

42 U.S.C. § 300gg-5 ..................................................... 1, 26, 27

42 U.S.C. § 300gg-22(a)(1)...................................................... 21

42 U.S.C. § 300gg-22(a)(2)................................................. 19, 21

42 U.S.C. § 300gg-22(b)(1)(b) ................................................ 20

42 U.S.C. § 300gg-22(b)(1)(b)(2) ........................................... 21

Consolidated Appropriations Act of 2021, Pub. L. 116-260,
    Div. BB, Title I,  134 Stat. 1182 (Dec. 27, 2020)........................ passim

**Court Rules**

Fed. R. Civ. P. 8 ............................................................................. 7

Fed. R. Civ. P. 12(b)(6) ............................................................ 2, 28

**Regulations**

45 C.F.R. pt. 150 subsec. B.................................................... 13, 14

Exec. Order No. 13,890, 84 Fed. Reg. 53,573 (Oct. 8, 2019) No. 13890 ...................................................................................... 14

**Other Authorities**

Blue Cross Blue Shield of Tennessee. (September 2025). BlueAlert. https://www.bcbst.com/docs/providers/bluealert/2025/Blue Alert-september.pdf?_gl=1*s1b87v*_gcl_au*MTU0NDg5MjA0M y4xNzY1NDY3ODM5 ................................................................. 6

Anthem Blue Cross and Blue Shield. (November 1, 2024) Commercial Reimbursement Policy: Anesthesia Services – Professional. https://files.providernews.anthem.com/5106/ME-Anesthesia-Services-policy-06122024.pdf............................... 5

Kaiser Foundation Health Plan of Washington. (July 25, 2024). Modifiers. https://wa-provider.kaiserpermanente.org/static/pdf/provider/commu nications/letters/20240725-modifier-policy.pdf ...................... 5

Highmark. *Highmark Reimbursement Policy Bulletin*. (November 2025). https://providers.highmark.com/content/dam/highmark/en /providerresourcecenter/rp-drafts/rp-068-030226.pdf .......................... 6

Medical Mutual of Ohio. (January 24, 2025). Reimbursement Policy: Anesthesia. https://www.medmutual.com/-/media/MedMutual/Files/Providers/CorporateReimbursementPolicies/Anesthesia_Reimbursement_Policy.pdf............................5

Cigna Healthcare. (March 12, 2023). Reimbursement Policy Commercial: Anesthesia Professional Services. https://static.cigna.com/assets/chcp/secure/pdf/resourceLibrary/clinReimPolsModifiers/R39_Anesthesia_Professional_Services.pdf............................................................................5

Independence Blue Cross. (August 29, 2025). Update to reporting and documentation requirements for anesthesia services. https://provcomm.ibx.com/pnc-ibc/news/Pages/Update-to-reporting-and-documentation-requirements-for-anesthesia-services.aspx ..........................................6

## INTRODUCTION

Throughout these proceedings, the government has described AANA's argument that the government's inaction has emboldened insurance companies to discriminate against nurse anesthesia providers as too speculative. Unfortunately, the AANA has been proven correct. As addressed below, now 9 different insurance companies have introduced policies throughout the nation to reduce CRNA reimbursement by 15% since the filing of this action. These reductions in reimbursement are based solely upon providers' licensure as nurses and continue to find support in the government's total abdication of its obligation to enforce the provider nondiscrimination provision of the Affordable Care Act. 42 U.S.C. § 300gg-5.

The law is not ambiguous. Indeed, it is very clear that insurance companies "shall not discriminate" based on licensure. The only requirement is that a provider be acting within the scope of their license (which nurse anesthesia providers are) and the only exception is to "establish varying reimbursement rates based upon quality or performance measures" – which is not at issue in this case. The only reason *any* uncertainty exists is that the law has *never* been enforced.

Interestingly, the government presents precious little argument in its brief to address any purported lack of standing and largely fails to address most of the arguments in AANA's opening brief. Instead, the government pivots, arguing failure to state a claim under Fed. R. Civ. P. 12(b)(6), something the district court did not address. Per this Court's precedent, this Court should not rule on these arguments in the first instance. However, were it to do so—given the clear and indefensible discrimination being fueled by perpetual government inaction—the Court should side with the AANA and remand this matter back to the district court for judgment in the AANA's favor.

## ARGUMENT

### A. AANA AND ITS MEMBERS PLED AND HAVE SUFFERED THE REQUISITE HARM

The government's singular argument on this point is that the AANA failed to show harm because it attached its standing affidavits to its response brief instead of to the Complaint. *See* Appellees' Br. at pg. 21. The government did not address any of AANA's arguments to the contrary, including the claims that: (1) There is no requirement that standing affidavits be attached to any particular document; (2) this Circuit has allowed standing affidavits to be attached to response briefs

or introduced at evidentiary hearings in similar cases; and (3) the AANA itself has suffered harm as an association. See Appellants' Br. at pgs. 15-17.

Instances like this are why associational standing exists. As the complaint pleads, and as the standing affidavits further bolster, the AANA's individual members have been harmed. The interests being protected are directly related to the AANA's mission, being the sole national advocacy group for the nurse anesthesia profession. Further, there is nothing about the claim being asserted nor the relief being requested that would mandate participation of an individual member.

Moreover, were any aspect of the pleadings insufficient, the appropriate remedy would have been to allow the AANA to amend its complaint. AANA argued consistently with well-settled Sixth Circuit jurisprudence that the district court was required to allow AANA to amend unless it found that an amendment could not cure the defect. *See* Brief of Plaintiff-Appellant. The government offered no rebuttal in response. In any event, because a technical deficiency (such as where to attach the standing affidavits) is so easily remedied, the district court erred in dismissal. And for all the reasons argued, the Complaint and

associated evidence adequately demonstrated that AANA and its members suffered an injury-in-fact.

## B. AANA PROPERLY PLED A CAUSAL CONNECTION BETWEEN THE GOVERNMENT'S ABDICATION OF ITS RESPONSIBILITY TO ENFORCE THE ACA NONDISCRIMINATION PROVISION AND THE HARM ITS MEMBERS ARE SUFFERING, ALL OF WHICH IS VERIFIED BY PUBLICLY AVAILABLE INFORMATION

The government challenges whether the AANA has sufficiently pled 'abdication' and then questions whether continued government inaction will yield further emboldening of the insurance companies to expand their discrimination against nurse anesthesia providers. With regards to abdication, when coupling over a decade of government inaction (during which neither rules have been promulgated nor enforcement been undertaken) with a continuing, demonstrable resistance to implement or enforce the law – the only reasonable conclusion is abdication. *See*, *e.g.*, Dkt. #1 (Compl.) at ¶ 10, PageID #4. This reflects a complete failure of HHS to fulfill its responsibility to protect the class of professionals this law was enacted to protect.

And it is unfortunately verifiable that continued abdication will embolden, in fact has emboldened, continued discrimination. Since the filing of the complaint, which cited two insurance companies'

discrimination against CRNAs, at least 7 more have followed suit, reducing their longstanding reimbursement of CRNAs from 100% of the CMS physician fee schedule to 85%.  Consider:

**QZ ANESTHESIA REIMBURSEMENT REDUCTIONS TIMELINE**

| Date | Payer | Action |
|------|-------|--------|
| March 2023 | Cigna (Nationwide) [1] | Reduced reimbursement for QZ from 100% to 85%. |
| November 2024 | Anthem Blue Cross Blue Shield (CA, CT, ME, MO, NV, NY, OH, VA) [2] | Reduced reimbursement for QZ from 100% to 85%. |
| December 2024 | Kaiser Foundation Health Plan of Washington[3] | Reduced reimbursement for QZ from 100% to 85%. (policy later rescinded). |
| January 2025 | Medical Mutual of Ohio[4] | Reduced reimbursement for QZ from 100% to 85%. |

[1] Cigna Healthcare. (March 12, 2023). Reimbursement Policy Commercial: Anesthesia Professional Services. https://static.cigna.com/assets/chcp/secure/pdf/resourceLibrary/clinReimPolsModifiers/R39_Anesthesia_Professional_Services.pdf

[2] Anthem Blue Cross and Blue Shield. (November 1, 2024). Commercial Reimbursement Policy: Anesthesia Services – Professional. https://files.providernews.anthem.com/5106/ME-Anesthesia-Services-policy-06122024.pdf

[3] Kaiser Foundation Health Plan of Washington. (July 25, 2024). Modifiers. https://wa-provider.kaiserpermanente.org/static/pdf/provider/communications/letters/20240725-modifier-policy.pdf

[4] Medical Mutual of Ohio. (January 24, 2025). Reimbursement Policy: Anesthesia. https://www.medmutual.com/-

| October 2025 | UnitedHealthcare (Nationwide)[5] | Reduced reimbursement for QZ from 100% to 85%. |
|---|---|---|
| October 2025 | Blue Cross Blue Shield of Tennessee[6] | Reduced reimbursement for QZ from 100% to 85%. |
| November 2025 (Effective March 2026) | Premera (WA, AK) [7] | Proposed reducing reimbursement for QZ from 100% to 85%. |
| November 2025 (Effective March 2026) | Highmark (PA, DE, NY) [8] | Proposed reducing reimbursement for QZ from 100% to 85%. |
| December 2025 | Independence Blue Cross (PA)[9] | Reduced reimbursement for QZ from 100% to 85% for both commercial and Medicare Advantage plans. |

/media/MedMutual/Files/Providers/CorporateReimbursementPolicies/Anesthesia_Reimbursement_Policy.pdf

[5] UnitedHealthcare. (August 2025). Reimbursement Policy Update Bulletin: August 2025. 8/1/2025 – UnitedHealthcare Commercial Reimbursement Policy Update Bulletin: August 2025

[6] Blue Cross Blue Shield of Tennessee. (September 2025). BlueAlert. https://www.bcbst.com/docs/providers/bluealert/2025/BlueAlert-september.pdf?_gl=1*s1b87v*_gcl_au*MTU0NDg5MjA0My4xNzY1NDY3ODM5

[7] Premera Blue Cross. Anesthesia Guidelines. November 4, 2025. https://www.premera.com/paymentpolicies/cmi_051695.pdf#search=anesthesia

[8] Highmark. *Highmark Reimbursement Policy Bulletin*. November 2025. https://providers.highmark.com/content/dam/highmark/en/providerresourcecenter/rp-drafts/rp-068-030226.pdf

[9] Independence Blue Cross. (August 29, 2025). Update to reporting and documentation requirements for anesthesia services. https://provcomm.ibx.com/pnc-ibc/news/Pages/Update-to-reporting-and-documentation-requirements-for-anesthesia-services.aspx

There is no speculation as to the impact of the government inaction. Federal law requires fact pleading, not the pleading of legal theories. Fed. R. Civ. P. 8., *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The Complaint lays out that the government has never enforced this provision in "clear abdication of its duty" to do so. *See*, *e.g.*, Dkt. #1 (Compl.) at ¶ 10, PageID #4. No more is required. And if it were, such a minor pleading defect is easily cured through amendment rather than dismissal with prejudice. *See, e.g., Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 n.1 (6th Cir. 2021).

## C. THE GOVERNMENT IMPROPERLY DESCRIBES THE AANA'S PLEADING OBLIGATIONS

The government faults the AANA for being "without evidence" that enforcement of the ACA non-discrimination provision would result in the insurance companies' agreeing to stop their discriminatory conduct. Appellees' Br. at pg. 15. The government further challenges this action based on the argument that the government did not affirmatively cause the resulting discrimination. While neither is required, a plain reading of the Complaint reveals that AANA alleges both.

The government adopted the district court's conclusion that since the government did not have a "determinative or coercive" effect on the

(now 9) insurance companies' decisions to decrease CRNAs' compensation by 15 percent, mandamus cannot be justified. *See* Appellees' Br. at pg. 21. In so doing, the government again failed to address any of the AANA's arguments to the contrary.

Most importantly, the government simply ignored the AANA's rigorous analysis, complete with a cite to now Justice Kavanaugh's opinion in *In re Aiken Cnty*, 725 F.3d 255, 259 (D.C. Cir. 2013) and the D.C. Circuit's opinion in *In re Public Employees for Environmental Responsibility*, 957 F.3d 267 (D.C. Cir. 2020), regarding how the judicially made "determinative or coercive" test does not apply to mandamus cases. The government's brief does not even acknowledge *Aiken*. Mandamus actions are grounded in government inaction, not upon government coercion. The coercion standard simply does not apply in the mandamus context.

The government also attempts to distinguish this case from *Natural Resources Defense Council v. National Highway Traffic Safety Administration* ("*NRDC*"), 894 F.3d 95 (2d Cir. 2018) by noting that the third parties at issue in that case admitted that if the government enforced a higher penalty, the third parties would alter their behavior.

While an interesting detail, it is certainly not a prerequisite fact. First off, such admissions are not easy to come by at the pleading stage. As the caselaw recognizes, it is well-settled that "[f]or standing purposes, petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. This is true even in cases where the injury hinges on the reactions of the third parties, here the auto manufacturers, to the agency's conduct." *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C. Cir. 1990) (citations omitted).

Moreover, were this a jurisdictional requirement, transgressors could simply avoid responsibility by expressing a willingness to continue to discriminate in the face of government enforcement action. This cannot be so. "Common sense and basic economics," tell us that the increased cost of unlawful conduct will make that conduct less common. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017).

Ultimately, the government's stance demands too much of AANA at the pleading stage, where well-pled allegations must be accepted as true for the purpose of evaluating a plaintiff's standing. *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 350-351 (6th Cir. 2024). It

ignores the commonsense economic realities of the highly regulated insurance industry. Should the government investigate this discrimination and institute enforcement actions that carry injunctive or financial penalties, as economically rationale actors, insurance companies would cease their discrimination to avoid the penalties. *See NRDC,* 894 F.3d at 104 ("[T]he notion that financial [incentives] deter environmental misconduct is hardly novel.") (citation modified). The inverse-willingness (here incentivized by profits) is evidenced by the fact that at least 9 insurance companies have all "independently" decided to reduce reimbursement for nurse anesthesia providers from 100% to 85% in the face of no enforcement, injunctive, or financial consequences.

### D. THIS COURT SHOULD NOT REACH THE GOVERNMENT'S 12(B)(6) ARGUMENT IN THE FIRST INSTANCE

A tacit admission that its challenge to standing is weak, the government asks this Court to, in the alternative, affirm the dismissal of the complaint for failure to state a claim. However, the district court did not rule on the government's 12b(6) arguments in the first instance (and the government raises several new arguments for the first time on this appeal), so this Court should be loath to address them in the first

instance. *See Maldonado v. Nat'l Acme Co.*, 73 F.3d 642, 648 (6th Cir. 1996) ("In general, an appellate court will not address issues on appeal that were not ruled upon below.") (citation omitted).

This principle serves important judicial administration purposes, including ensuring that district courts consider issues first and preventing surprise to litigants."). Indeed, this Court will only reach issues in the first instance where "the proper resolution is beyond doubt" and "injustice might otherwise result." *Meade v. Pension Appeals & Review Comm.,* 966 F.2d 190, 194 (6th Cir.1992) (citation modified); *In re Allied Supermarkets, Inc.* 951 F.2d 718, 725 (6th Cir.1991). That is not the case here.

### E. THE GOVERNMENT'S THEORIES REGARDING WHY IT CANNOT ENFORCE THE NON-DISCRIMINATION CLAUSE LACK MERIT

The government offers myriad of excuses as to why, since Congress enacted the law in 2010, it has not pursued a single enforcement action or investigation regarding the ACA's non-discrimination provision. The federal government first argues that it is really the States' responsibility to enforce the law. In the alternative it argues that, if actually the federal government's responsibility, HHS is unable to conduct any enforcement

actions because there are no "guidelines" on how to enforce the law. Lastly, it contends that since it is unclear what aspect of enforcement responsibility lies with HHS, the Department of Treasury, or the Department of Labor, the proper response is to throw its hands up and have no one enforce the law. *See* Appellees' Br. at pgs. 12, 19, 27 21. These excuses, while presented as reasons to dismiss the AANA's complaint for failure to state a claim, actually highlight the need for mandamus to issue.

### 1. HHS's Failure to Complete Rulemaking Cannot Be the Justification for the Government's Inaction

The government cannot create the problem, possess the sole authority and requirement to create a solution, refuse to identify a solution, and then point to the fact that no solution exists as justification for further inaction. The missing "guidelines" are the rules that HHS itself should have drafted and implemented over a decade ago. But HHS has failed to adhere to the legislative mandate not once, but twice. After a decade of non-compliance, Congress again asked HHS to write such rules in 2020 as part of the No Surprises Act[10], mandating that the

---

[10] Signed into law as part of the Consolidated Appropriations Act of 2021 (Public Law 116-260, 134 Stat. 1182, Div. BB, § 109).

Secretary promulgate rules regarding the enforcement of Section 2706 of the Public Health Service Act (42 U.S.C. §300gg-5(a)) within six months, *i.e.*, no later than January 1, 2022. *See* No Surprises Act Section 108. This obligation rested with the federal government, alone. Despite the clear mandate that implementation of this provision was still expected, the government has promulgated no such rules. In fact, no proposed rules have even been published in the Federal Register, and HHS still has not implemented any protections under the non-discrimination provision. Dkt. #1 (Compl.) at ¶56, PageID #13-14. If well more than a decade of inaction and refusal to implement direct legislative mandates cannot suffice to demonstrate abdication, it has become a legal theory without meaning.

HHS claims it already has a regulatory framework for enforcement, but the only support offered for this position is reference to the same federal regulation cited in its motion to dismiss. (Appellees' Br. at 32.) That provision, Subsection B of 45 C.F.R. Pt. 150, does not establish the existence of the regulatory framework that Congress mandated in the No Surprises Act. The salient portion of that provision, entitled "Circumstances requiring CMS enforcement" was last amended in 2013.

That is seven years before Congress even instructed HHS to promulgate rules to address their ongoing failure to enforce Section 2706 via the No Surprises Act. *Id.* at Pt. 150.203. The mere sequencing of events undermines any claim that this regulatory framework could suffice to address the rulemaking that Congress ordered. *See also* President Trump's Executive Order of October 3, 2019, on Protecting and Improving Medicare for Our Nation's Seniors (ordering HHS to conduct a comprehensive review of regulatory policies that create disparities in reimbursement between physicians and non-physician practitioners and proposing a regulation that would, to the extent allowed by law, ensure that items and services provided by clinicians, including physicians, physician assistants, and nurse practitioners, are *appropriately reimbursed in accordance with the work performed rather than the clinician's occupation*). Exec. Order No. 13890, 84 Fed. Reg. 53,573, 53,574 (Oct. 8, 2019) (emphasis added).

HHS has repeatedly disregarded Congress's instructions. It failed to undertake the required rulemaking not once, but twice. Arguably, this could be forgiven if HHS were actually enforcing the law, but instead HHS is using its own failure as a basis to justify further inaction.

Because HHS has repeatedly failed to act, judicial review and intervention is warranted. Mandamus is the only remaining mechanism capable of compelling the agency to perform the duty Congress imposed.

Congress made its expectations clear: HHS could not continue to stand by and do nothing. Yet even in the years since redoubling the obligation via the No Surprises Act, HHS continues to take no action. The law provides a clear prohibition of discrimination based upon license. The No Surprises Act provided concrete and mandatory enforcement instructions. Yet nothing has been done and relief is warranted.

Mandamus is an exceptional remedy, but this is an exceptional situation. Congress imposed a mandatory duty that the agency has chosen to ignore for well over a decade. These circumstances leave the Court with no meaningful alternative. A remedy that orders Appellees to follow Congress's lawful instruction is the only path consistent with Congress's unambiguous directive. Because Appellees have failed to take any steps to enforce the law – not even the minimal step of initiating rulemaking, the District Court has jurisdiction to hear this case, and its dismissal should be reversed.

> 2. **Any Role the Departments of Labor or Treasury Have in Rulemaking Does Not Alter HHS's Ultimate**

Enforcement Authority and Cannot be Presented as Justification for Inaction or to Avoid Mandamus

The fact that the government contends that HHS, the Department of Labor, and the Department of Treasury all have "parallel" enforcement authority is no bar to AANA's mandamus action. Appellees' Br. at 4. The government invokes the "complexity of the enforcement scheme," yet its defensiveness demonstrates the depth of its abdication. Appellees' Br. at 19. Fourteen years after passage of the ACA and the government cannot take a clear position as to which agency is responsible for enforcement of the ACA's non-discrimination provision? Nothing could better demonstrate the magnitude of abdication than the fact that the agency responsible for the ultimate enforcement of this provision cannot, with certainty, verify even that most basic information related thereto. Governing is hard. This problem has spanned multiple administrations. So, while not originally a problem of this Secretary's creation, Congress has vested the Secretary with the responsibility to mend the problem. We call upon him to do so. HHS cannot simply throw its hands up in defeat feigning uncertainty as to whose problem this is to solve.

Simply put, Appellees' attempt to reframe the issue through the purported "parallel" enforcement authorities of the Department of Labor

and the Department of the Treasury misses the mark. Appellees claim that because the Departments of Labor and Treasury also possess enforcement authority under ERISA and the Internal Revenue Code, the Court cannot award complete relief here because only HHS and Secretary Kennedy are parties. Appellees' Br. at 4, 19. That position simply reframes and reiterates the government's earlier claim that mandamus is inappropriate because states have primary enforcement authority over the non-discrimination provision. Only now, it drags the Departments of Labor and Treasury into the fight. This refurbished argument fails for the same reason its predecessor failed. Congress assigned HHS specific, non-optional duties to enforce the non-discrimination provision. HHS has ignored those duties. The presence of other agencies with related authority does nothing to excuse that failure.

Just as the AANA should not have to file 50 mandamus actions in each state to compel the necessary government action, it should not have to file 52 separate mandamus actions because the Departments of Labor and Treasury have responsibilities under ERISA and the Internal Revenue Code.

Congress required HHS, not Labor nor Treasury, to implement and enforce the provision at issue through the implementation of rulemaking geared at enforcing the provision. Pub. L. 116–260, Div. BB, Title I, §108, Dec. 27, 2020, 134 Stat. 2859. The No Surprises Act did not direct Labor or Treasury to enforce the specific non-discrimination mandate at stake here. Congress had already placed that obligation with HHS through the ACA to no effect. The No Surprises Act reiterated that obligation and required HHS, as a bare minimum, to initiate rulemaking. *Id.* That still has not occurred. Congress issued that directive to HHS alone, and HHS has failed to satisfy even that most basic responsibility and has demonstrated no willingness to enforce this provision of the law.

### 3. The States' Parallel Authority to Enforce This Provision of Federal Law Does Nothing to Relieve HHS of its Ultimate Enforcement Authority

That the States have parallel authority to enforce the ACA is no bar to this mandamus action. The government concedes that HHS has primary and direct enforcement authority with respect to non-federal government plans, and parallel enforcement authority with respect to all others. *See* Appellees' Br. at pgs. 3-4. 42 U.S.C. § 300gg-22(a)(2) also requires HHS to determine if the States are pursuing anti-discrimination

enforcement investigations.  Like HHS's complete abdication to conduct any enforcement actions of its own, HHS makes no contention that it has done a single thing to determine if the States have conducted any non-discrimination enforcement actions (it has not).  As pled in the Complaint, the Secretary has been informed many times about violations of Section 2706 and has chosen never to act even though the Section says he shall do so upon being notified.  Dkt. #1 (Compl.) at ¶55, PageID #13.  The additional fact that the law explicitly refused to allow for a private right of action makes the government abdication of its responsibility problematic and underscores the resulting need for mandamus.

The government also presents an underdeveloped argument that it would have to first determine if the States have done anything to enforce Section 2706 *before* it could proceed with enforcement efforts and that the failure of this to have occurred somehow precludes redressability.  This amounts to a claim, on the one hand, that the federal government has "unreviewable enforcement discretion," and on the other, that it is the states which must ultimately enforce the ACA.  Both cannot be true.  The government seeks to make State enforcement effort a condition precedent to any federal enforcement authority.  It is not.

The ACA is a federal law passed by the United States Congress and is ultimately up to the federal government to implement and enforce. The federal government cannot simply delegate the enforcement of a federal law to the States and declare itself immune from suit as a result. *In Re Aiken County* at 266 (D.C. Cir. 2013) (Kavanaugh, J.) (granting mandamus and holding: "[t]his case has serious implications for our constitutional structure. It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law in the manner asserted in this case by the Nuclear Regulatory Commission. Our decision today rests on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress in the circumstances here").

Moreover, the statutory scheme is far simpler than the government acknowledges — it is the Secretary of HHS, and not the States, who holds the ultimate enforcement responsibility when Section 2706 is violated, and nothing has been done to enforce it. 42 U.S.C. § 300gg-22(b)(1)(b). Further, the penalty provision, allowing a $100 a day fine per violation, can only be implemented federally and not at the State level. 42 U.S.C. §

300gg-22(b)(1)(b)(2). When faced with ongoing discriminatory conduct, the federal government *always* possesses the right to seek injunctive relief to end the discriminatory behavior that is violating the rule.

Further, 42 U.S.C. § 300gg-22(a)(1) says that States *may* require health insurance companies to comply with the ACA but imposes no obligation on them to do so. Contrast that with Section 22(a)(2), which states that if one of the States have failed to enforce such a provision of the ACA, the Secretary "*shall* enforce such provision." Contrary to the government's contention, "shall" connotes a requirement. *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024); *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("Unlike the word 'may,' which implies discretion, the word "shall" in a statute usually connotes a requirement.")(internal quotation marks omitted).

### 4. The Law Abhors an Absurd Result, and Concluding That No Path Exists to Remedy This Clear Discrimination In Violation of a Valid Law is Absurd

Counsel would ask rhetorically: if mandamus is not the answer, then what is?

Given the imbalance of power between providers and insurers, insurance companies have insulated themselves from legal action. The

only entity with sufficient gravitas to allow for a fair fight is the federal government. The law prohibiting this already exists. All that is needed is for someone to enforce the law – and the only means to compel the fulfillment of that legal duty appears to be via mandamus.

The government endeavors to maneuver the AANA into a catch-22. If the relief sought was an explicit demand that the non-discrimination provision be applied to the current circumstances involving the AANA, the government response would be to rely upon ample case law that individual enforcement decisions are not subject to mandamus. Understanding this, and threading the needle, the AANA merely seeks enforcement of the ignored provision and recounts the actual discrimination that is spreading like wildfire – both to demonstrate that this is a concrete problem facing its members, not an academic exercise, and to offer an easy place to start if so ordered. In response the government argues that *even if* compelled, it might elect to enforce *other* instances of provider nondiscrimination violations (without pointing to any). Such a response either highlights the need for mandamus (assuming there are a multitude of other instances of provider license-based discrimination needing to be remedied and simply awaiting action)

or reflects a willingness to be punitive against nurse anesthesia providers for seeking the protection of a law designed and enacted to protect them and that is simply not being enforced.

HHS's refusal to follow clear congressional instructions has real consequences. It leaves patients with reduced access to essential medical services, precisely the harm Congress sought to prevent. *See, e.g.*, Dkt. #1 (Compl.) at ¶ 14, PageID #4-5. Appellees' reliance on the enforcement authority of states or other agencies is a distraction. Congress mandated HHS action and HHS has refused to act, and the Court should reject Appellees' arguments on these points.

## F.   HHS'S FAILURE TO EVER ENFORCE THE NONDISCRIMINATION PROVISION IS REVIEWABLE BY FEDERAL COURTS UNDER BOTH A MANDAMUS THEORY AND UNDER THE APA

In mandamus cases, which inherently involve court discretion, courts have often spoken in strong, and occasionally even absolute, language regarding the court's duty to enforce agency action mandated by Congress. "If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose." *Estate of*

*Smith v. Heckler*, 747 F.2d 583, 591 (10th Cir.1984) (granting mandamus to plaintiff's and compelling the Secretary of HHS to properly enforce the Medicaid Act)(citation omitted); *see Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997) ("as a reviewing court, we must 'compel agency action unlawfully withheld or unreasonably delayed.'"); *Armstrong v. Bush*, 924 F.2d 282, 293 (D.C. Cir. 1991) (in an APA action, based on statutory language that stated that the government "shall establish and maintain' a records management program," ordering the government to actually establish and maintain a records management program.).

The Sixth Circuit has agreed. In *Gillis v. HHS*, the Sixth Circuit held that if "HHS has totally abdicated its statutory responsibility" the court can and should step in to compel action. "When agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates." *Gillis v. U.S. Dep't of Health and Hum. Servs.*, 759 F.2d 565, 578 (6th Cir. 1985) (citing *Public Citizen Health*

*Research Group v. Commissioner*, 740 F.2d 21, 32 (D.C. Cir. 1984) (internal citations omitted)).  That is plainly the case here.

### G. THE GOVERNMENT'S BELATED (AND WAIVED) ADOPTION OF UNJUSTIFIED ARGUMENTS PRESENTED IN AN UNSOLICITED (AND REJECTED) AMICUS BRIEF ALSO FAIL

The government argues that "provider non-discrimination provision does not clearly prohibit paying nurse anesthetists less than physician anesthesiologists." Appellees' Br. at 21.  This is an argument that the government did not raise below, and it is therefore waived. *See*, *e.g.*, *United States v. McDowell Contractors, Inc.*, 668 F.2d 256 (6th Cir. 1982).  Indeed, this is an argument that was raised in the purported amicus brief of the American Society of Anesthesiologists (and in which the government did not join).  Dkt. #15-1 (Amicus Br.).  This district court dismissed the ASA's brief as moot.   Dkt. #23 (Mem. Op. & Order).  But the AANA fully responded to this argument below and incorporates that response here.  See Dkt. #19 (Resp. in Opp.).

In summary, in any question of statutory interpretation, the Court "must first look to the language of the statute itself." *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 371 (6th Cir. 2007)

(citation omitted).  The plain language of the statute, 42 U.S.C. § 300gg-5, is clear:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall not discriminate with respect to participation under the plan or coverage against any health care provider who is acting within the scope of that provider's license or certification under applicable State law.

Anesthesia is unique.  When a properly licensed and credentialed physician is administering anesthesia, it is the practice of medicine. When a properly licensed and credentialed nurse anesthesia provider is administering anesthesia, it is the practice of nursing. Both professions are administering the same anesthesia, utilizing the same equipment, treating the same patients, applying the same methods and standards, and most importantly providing the same quality of care yielding the same likelihood of a positive outcome.  And most relevant to this regulatory provision, each are authorized to perform these acts under their respective license.

So, when an insurance plan is paying less to a provider who is acting within the scope of their license solely because of their license – that is the exact discrimination this law prohibits on its face.  Any contrary reading must turn on its faulty assumption that since CRNAs

and physicians have different licenses, it is justifiable to discriminate among those two licenses when it comes to reimbursement for the same performance of the same services on the same patients.

Similarly, arguments-identifying differences in the scope of practice "under applicable state law" are red herrings. In all 50 States, CRNAs are acting within the scope of their state-issued licenses when independently administering anesthesia and then billing for it under modifier QZ. The fact that, in certain States, nurse anesthesia providers may not be licensed to prescribe perioperative medication, perform surgery, drive cabs (for which 13-16 states require specialized licensing), or be an auctioneer (which requires licensing in 25 States) is irrelevant to this analysis. What is relevant is that the care they are providing when administering anesthesia QZ reflects a nurse anesthesia provider "acting within the scope of that provider's license." 42 U.S.C. § 300gg-5. The government is simply allowing this blatant discrimination to occur.

## CONCLUSION

Most professions would not stand for being discounted – figuratively and literally – but nurses are committed to their patients. It is the very nature of nurses, as nurses, that makes them so well suited

for the administration of anesthesia and keeps them at the bedside administering anesthesia and committed to their patients. Before anesthesia was a profession – young surgeons were enlisted to administer anesthesia – but oftentimes the young surgeon would be more interested in the surgical procedure which could distract them from the patient. Not paying attention to the patient's breathing, level of sedation, or discomfort had consequences. And it was the nature of nurses – to block out everything else and focus in on the welfare of the patient in front of them – that made nurses so well suited to the administration of anesthesia. Therein was born the profession. Nurse anesthesia providers are not ashamed of being nurses – to the contrary they are proud of it – and will not stand for being discriminated against because they are nurses. The law does not allow it – nor should the Courts.

For the foregoing reasons, the AANA clearly has standing. As such, this Court should remand it back to the district court, who can then consider the government's motion under Fed. R. Civ. P. 12(b)(6). Should this Court address the government's 12(b)(6) arguments on appeal, it should side with the AANA. And if it does so, the only thing left to do would be to remand this case back to the district court for the

determination of the appropriate remedy and entry of judgment in the AANA's favor. In the alternative, if the government seeks to avoid mandamus to allow for the completion of its overdue rulemaking, the AANA would join in any effort to enjoin insurance companies' discriminatory reimbursement of nurse anesthesia providers until rules were promulgated and implemented.

It remains time for us to focus on the degree of the care provided and not on the degree of the care provider.

Respectfully submitted,

*s/ Mark Silberman*
MARK J. SILBERMAN
CHRISTOPHER T. GROHMAN
DAVID M. HOPKINS
Benesch, Friedlander, Coplan & Aronoff LLP
71 S. Wacker Drive, Ste. 1600
Chicago, Illinois 60606
Telephone: 312-212-4949
Facsimile: 312.767.9192

*Attorneys for Plaintiff-Appellant American Association of Nurse Anesthesiology*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the documents exempted by Fed. R. App. P. 32(f), this document contains 5,510 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14pt Century font.

_s/ Mark  Silberman_
One of the Attorneys for Plaintiff-Appellant American Association of Nurse Anesthesiology

## CERTIFICATE OF SERVICE

The foregoing Reply Brief of Plaintiff-Appellant American Association of Nurse Anesthesiology has been served upon Defendants-Appellees this 18th day of February, 2026 via the Court's electronic filing system.

*/s/ Mark J. Silberman*
One of the Attorneys for Plaintiff-Appellant American Association of Nurse Anesthesiology